E filing

1 CHAPIN FITZGERALD SULLIVAN & BOTTINI LLP
  Edward D. Chapin, Esq. (SBN: 053287)
2 echapin@cfsblaw.com
  Francis A. Bottini, Esq. (SBN: 175783)
3 fbottini@cfsblaw.com
  Jill M. Sullivan, Esq. (SBN: 185757)
4 jsullivan@cfsblaw.com
  Keith M. Cochran, Esq. (SBN: 254346)
5 kcochran@cfsblaw.com
6 550 West C Street, Suite 2000
  San Diego, California 92101
7 Tel: (619) 241-4810
8 Fax: (619) 955-5318

FILED

JUL - 3 2012

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

9 Attorneys for Plaintiffs and the Classes

10                **UNITED STATES DISTRICT COURT**

ADR

11              **NORTHERN DISTRICT OF CALIFORNIA**

12 | JANET MLYNAR and MATTHIAS         | CASE NO.  **C12-03477** NC
13 | HILDEBRANDT, on behalf of themselves and
   | all others similarly situated,         | CLASS ACTION COMPLAINT
14 |
15 |                    Plaintiffs
16 |                                        | **JURY TRIAL DEMANDED**
   |                       v.
17 |
   | FIRST AMERICAN TITLE INSURANCE
18 | COMPANY, a California corporation, FIRST
   | AMERICAN TITLE COMPANY OF NAPA, a
19 | California corporation, FIRST AMERICAN
   | NATURAL HAZARD DISCLOSURES, LLC,
20 | a California company, FIRST AMERICAN
   | HOME BUYERS PROTECTION
21 | CORPORATION, a California corporation,
   | and PACIFIC UNION INTERNATIONAL,
22 | INC., a California corporation,
23 |
   |                    Defendants
24
25
26
27
28

-1-

Class Action Complaint

## I.   NATURE OF THE ACTION

1.      This is a class action lawsuit against certain wholly-owned subsidiaries of First American Financial Corporation ("First American") and Defendant Pacific Union International, Inc. ("Pacific Union"). As alleged herein, Defendants violated federal and state law during the class periods (defined below) by paying and/or receiving fees, kickbacks, and other valuable consideration to real estate agents and brokers for the referral of real estate settlement service business. Defendants carried out their unlawful scheme through, among other methods, software platforms that facilitated the placement of settlement service business and allowed kickbacks and referral fees to be disguised as "sublicense fees" or "access fees."

2.      Under the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2607, *et seq.,* "[n]o person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person."

3.      In violation of RESPA, Defendants and certain of its subsidiaries and affiliates engaged in a scheme to provide real estate agents and brokers, including Defendant Pacific Union, with fees, kickbacks and other valuable consideration for the referral of real estate settlement service business. For instance, Defendants utilized web-based transaction management software such as TransactionPoint. Through these software programs, agents or brokers selected real estate settlement service providers for real estate transactions and, in turn, real estate brokers and agents entered into standard form sublicensing agreements with vendors, including Defendants, to enable the vendors to be listed and selected through TransactionPoint as service providers for the transaction. Under the guise of "sublicense fees" or "access fees," Defendants paid real estate agents and brokers predetermined fees for each referral of real estate settlement service provided. Different fees were charged for different services. In all transactions, however, real estate agents and brokers performed no *bona fide* work for the fees. In short, the scheme allowed Defendants and participating real estate agents and brokers to camouflage illegal kickbacks and referral fees as sublicense payments. In other cases, defendants provided the real estate agents with payments for allegedly performing other services even though no services were actually provided.

1    4.   Payments made under sublicensing agreements by Defendants and other vendors

2 were not nominal. For example, in exchange for referral of home warranty policies, kickback

3 payments constituted $15 to $30 per referral. Similarly, in exchange for referral of title insurance

4 policies, kickback payments frequently equaled or exceeded $100 per policy. The amount of the

5 kickback was frequently linked to the profitability or cost of the given settlement service. Thus, the

6 more lucrative the service, the steeper the kickback.

7    5.   During the class periods, hundreds, if not thousands, of real estate agents and brokers

8 executed sublicensing agreements, including through TransactionPoint, in which Defendants agreed

9 to pay and/or receive kickbacks for referrals. All TransactionPoint sublicense agreements that

10 Defendants entered into with real estate agents and brokers during the class periods have been

11 virtually identical standard form agreements. In other situations where Defendants paid kickbacks to

12 real estate agents, other standard form agreements were used in an attempt to disguise the nature of

13 the payment as a kickback. During the class periods, Defendants also sometimes fabricated a story

14 or explanation that they were paying the real estate agents a "marketing fee" or "administrative fee"

15 for promoting and/or placing the home protection contracts or other real estate settlement services

16 sold by Defendants through escrows involving federally related mortgages. The "marketing fees"

17 were not paid for any service actually performed, and were entirely devised as a means to attempt to

18 disguise the illegal kickbacks and avoid detection by consumers, the United States Department of

19 Housing and Urban Development ("HUD"), and federal and state regulators. As noted *infra*, HUD

20 has definitively found that payment of marketing fees under these circumstances constitutes a

21 violation of Section 8 of RESPA.

22    6.   Defendants have engaged in the illegal kickback scheme for years, during which time

23 they actively concealed the kickbacks from consumers and federal and state regulators. At various

24 times during the class periods, HUD initiated non-public investigations and inquiries into the

25 TransactionPoint scheme and the related licensing agreements that masked the unlawful kickbacks

26 and referral fees. For example, HUD launched a non-public investigation into the TransactionPoint

27 scheme in 2009 in response to a formal complaint from former Senator Bob Dole to HUD's General

28 Counsel.

7.    In July 2011, HUD publicly disclosed its investigation into TransactionPoint for the first time, noting that real estate settlement service providers utilized the software program to make unlawful kickbacks and improper referral fees in violation of RESPA. Although HUD later announced that one of First American's competitors (Fidelity National Financial, Inc.) was a participant in the scheme, it did not identify First American by name at the time.

8.    Throughout and following the class periods consumers had no basis or reason to discover the unlawful scheme. Real estate agents and brokers involved in the scheme never disclosed to their clients the illegal fees they were receiving, and the use of TransactionPoint or other agreements was not disclosed on HUD-1 real estate transaction closing statements.

9.    As discussed in greater detail below, Defendants violated RESPA, 12 U.S.C. §§ 2601, *et seq.*, by giving or receiving fees and kickbacks in exchange for the referral of real estate settlement services involving federally related mortgage loans. Defendants also violated RESPA by giving or receiving a portion, split, or percentage of charges for real estate settlement services involving federally related mortgage loans. In addition, Defendants violated California Insurance Code Sections 12404-12406 and 12760 and California's Unfair Competition Law, California Business & Professions Code Sections 17200, *et seq.* ("UCL") by paying commissions to real estate agents and brokers as an inducement or compensation for the sale of home protection contracts, title insurance policies, and other real estate settlement service business.

## II.    JURISDICTION AND VENUE

10.    Jurisdiction exists under RESPA, 12 U.S.C. § 2601 et seq. This case arises in part under the laws of the United States. Accordingly, federal question jurisdiction exists pursuant to 28 U.S.C. §1331.

11.    Venue is proper in this Court because one or more of the Defendants are located within this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## III. PARTIES

### A. Plaintiffs

12.     Plaintiff Janet Mlynar is a California resident and citizen. She purchased, paid for, and received real estate settlement services, including escrow and title policy services, from Defendant First American Title Company of Napa in connection with the close of escrow on a residential home at 1157 Division Street, Napa, California 94559 involving a federally related mortgage. The escrow on the transaction closed on or about July 13, 2005. The real estate broker in the transaction for Plaintiff was Defendant Pacific Union International, Inc. ("Pacific Union"). Pacific Union is one of the real estate brokers which was identified by HUD as having signed sub-license agreements to use TransactionPoint. Also, HUD documents indicate that Pacific Union had a practice of requiring its agents to put all orders for real estate settlement services through TransactionPoint, and would withhold commission checks from its agents until the agents had done so. Upon information and belief, a portion of the fees paid for the real estate settlement services provided by Defendant First American Title Company of Napa to Plaintiff were paid by Defendant to Pacific Union as a kickback for the referral of real estate settlement services in Plaintiff's real estate transaction. Upon information and belief, the price Defendants charged for the real estate settlement services purchased by Plaintiff were inflated due to the commissions, fees or kickbacks paid by Defendants. Plaintiff believes that these allegations will likely have evidentiary support after a reasonable opportunity for discovery.

13.     Plaintiff Matthias Hildebrandt is a California resident and citizen. He purchased, paid for, and received real estate settlement services, including a home warranty plan, from Defendant First American Home Buyers Protection Corporation in connection with the close of escrow on a residential home at 7037 La Tijera Blvd., Los Angeles, California 90045 involving a federally related mortgage. The escrow on the transaction closed on or about July 18, 2003. The real estate broker in the transaction for Plaintiff was Coldwell Banker. Coldwell Banker is one of the real estate brokers which was identified by HUD as having signed sub-license agreements to use TransactionPoint. Upon information and belief, a portion of the fees paid for the real estate settlement services provided by Defendant First American Home Buyers Protection Corporation to

-5-

1 Plaintiff were paid by Defendant to Coldwell Banker as a kickback for the referral of real estate
2 settlement services in Plaintiff's escrow transaction. Upon information and belief, the price
3 Defendants charged for the real estate settlement services purchased by Plaintiff were inflated due to
4 the commissions, fees or kickbacks paid by Defendants. Plaintiff believes that these allegations will
5 likely have evidentiary support after a reasonable opportunity for discovery.

6 **B. Defendants**

7 14. Defendant First American Home Buyers Protection Corporation ("FAHBPC") is a
8 California corporation with its principal place of business at 7833 Haskell Avenue, Van Nuys,
9 California 91406. It is a subsidiary of First American Financial Corporation. Its agent for service of
10 process is Registered Agent Solutions, Inc. located at 1220 S. Street, Suite 150, Sacramento,
11 California 95811.

12 15. Defendant FAHBPC is licensed to issue home warranty plans in all states and the
13 District of Columbia. Effective October 1, 2008, however, FAHBPC ceased writing new and
14 renewal business in Alabama, Connecticut, Delaware, Illinois, Louisiana, Massachusetts, Minnesota,
15 New Jersey, New York, Oklahoma, Rhode Island, Washington, and Wisconsin. FAHBPC sells
16 more than $170 million worth of home warranty plans each year and sells more home warranty plans
17 in California than in any other state. For example, in 2007, FAHBPC wrote 412,000 home warranty
18 contracts for $170 million of direct premiums. Of the direct premiums written $59.6 million (35%)
19 was written in California, $35.8 million (21.1%) was written in Texas, $12.8 million (7.5%) was
20 written in Arizona, and $61.8 million (36.4%) was written in the remaining states.

21 16. Defendant First American Title Insurance Company is a California corporation with
22 its principal place of business located at 1 First American Way, Santa Ana, California 92707. It is a
23 subsidiary of First American Financial Corporation, providing title insurance policies and other real
24 estate settlement services. Its agent for service of process is Lawyers Incorporating Service, located
25 at 2730 Gateway Oaks Drive, Suite 100, Sacramento, California 95833.

26 17. Defendant First American Title Company of Napa is a California corporation with its
27 principal place of business in Napa, California. Its agent for service of process is Andrea Schrader,

28

1   1700 Second Street, Suite 120, Napa, California 94559. It is a subsidiary of Defendant First
2   American Title Insurance Company.

3       18.     Defendant First American Natural Hazard Disclosure, LLC is a California company
4   with its principal place of business at 1004 West Taft Avenue, Orange, California 92865. Its agent
5   for service of process is Timothy P. Sullivan, 1 First American Way, Santa Ana, California 92707.
6   It is a subsidiary of First American Financial Corporation.

7       19.     Defendant Pacific Union International, Inc. is a California corporation with its
8   principal place of business located at One Letterman Drive, Building C, Suite 500, San Francisco,
9   California 94129. It is a real estate company that provides real estate brokerage services to
10  consumers.

11  **IV.    NON-DEFENDANT CO-CONSPIRATORS**

12      20.     During the class periods, Defendants conspired with each other and with numerous
13  real estate agents and firms regarding kickbacks and unlawful compensation paid to the real estate
14  agents. While not named as defendants herein (other than Defendant Pacific Union), the real estate
15  agents and firms were essential parties to the violations of law committed by Defendants.

16      21.     Defendants conspired with hundreds, if not thousands, of real estate agents and firms
17  concerning the kickbacks and unlawful compensation. While the full identity of all the real estate
18  agents is within the exclusive knowledge of Defendants, information acquired by Plaintiffs indicates
19  that Defendants conspired with and signed licensing agreements with, at a minimum, Defendant
20  Pacific Union and Non-Defendants Coldwell Banker, Empire Realty Associates, Intero Real Estate,
21  DRM Diversified, LLC, DRM Pacific Properties, Inc., RE/MAX Valley Properties, Remax Camino
22  Real, and numerous other brokers throughout California and the rest of the United States.

23  **V.    SUBSTANTIVE ALLEGATIONS**
24

25      22.     Congress enacted RESPA to protect home buyers "from unnecessarily high
26  settlement charges by certain abusive practices." 12 U.S.C. § 2601(a). RESPA, Section 8(a)
27  provides, "No person shall give and no person shall accept any fee, kickback, or thing of value
28  pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a

1  real estate settlement service involving a federally related mortgage loan shall be referred to any
2  person." 12 U.S.C. § 2607(a). RESPA, Section 8(b) provides, "No person shall give and no person
3  shall accept any portion, split, or percentage of any charge made or received for the rendering of a
4  real estate settlement service in connection with a transaction involving a federally related mortgage
5  loan other than for services actually performed."

6      23.    During the class periods, Defendants and their subsidiary and parent companies
7  marketed and sold real estate settlement services, including but not limited to, title insurance, escrow
8  services, home warranty services, appraisal services, flood and natural hazard certification services,
9  credit reporting services, property and casualty insurance services, mandatory disclosure reports, tax
10  services, and other real estate settlement services throughout the United States. The real estate
11  settlement services were sold during the class periods to consumers as part of escrows involving the
12  purchase and sale of residential homes involving federally insured mortgage loans. Defendants
13  incentivized real estate brokers and agents to sell their real estate settlement services by paying the
14  agents and brokers a fee, kickback, or commission in exchange for the referral of the real estate
15  settlement service.

16      24.    The fees, kickbacks, or commissions paid by Defendants to the real estate agents and
17  brokers were directly tied to the number of home protection contracts, title policies, escrow services,
18  and other real estate settlement services sold through escrow. Due to Defendants' payment of the
19  fees, kickbacks, or commissions, the prices of the real estate settlement services provided by
20  Defendants to Plaintiffs and the classes, during the class periods, were inflated, and were higher than
21  they would have been if the kickbacks or commissions had not been paid.

22      25.    Moreover, the prices charged by Defendants to consumers in California for real estate
23  settlement services and home protection contracts were inflated as a result of the kickbacks and
24  commissions. Thus, even consumers who did not acquire home protection contracts through escrow,
25  and even consumers who purchased real estate settlement services from Defendants in transactions
26  where TransactionPoint was not utilized, were still damaged by being charged inflated prices for
27  home protection contracts and real estate settlement services.

28

26.     The real estate agents and brokers did not provide any real estate settlement services, or if any services were provided, they were not actual, necessary, and distinct from the primary services provided by the real estate broker or agent; were nominal; and were duplicative of other fees charged.

27.     Defendants conducted a portion of their kickback scheme through the use of the web-based transaction management software known as TransactionPoint. The TransactionPoint platform automates a real estate transaction from listing to closing, and allows the real estate agent or broker to select real estate settlement service providers such as First American-related companies.

28.     The real estate brokers and agents that licensed TransactionPoint, in turn, entered into standard form sublicense agreements with subsidiaries of First American to enable First American's subsidiaries to be listed in the TransactionPoint software as providers of real estate settlement services.

29.     As part of the sublicense agreements, Defendants paid the real estate agents and brokers (including Defendant Pacific Union) a predetermined fee for each referral of the real estate settlement service provided.  These payments were not in exchange for settlement services actually provided and were not nominal payments.  For example, in the case of kickbacks in exchange for the referral of home protection contracts, the payments averaged approximately $15 per policy.   In the case of kickbacks in exchange for the referral of title insurance/escrow, the payments frequently equaled or exceeded $100 per transaction. Moreover, in a particular transaction, real estate agents or brokers frequently received multiple kickbacks/referral fees from Defendants for different types of settlement services provided.

30.     During the class periods, Defendants paid, and real estate agents and brokers (including Defendant Pacific Union) received, millions of dollars in kickbacks and referral fees through TransactionPoint sublicense agreements and other standardized agreements.  Kickbacks and referral fees paid through the TransactionPoint sublicensing agreements and other agreements were paid only when transactions closed.  The real estate agents and brokerages performed no work for such kickbacks and referral fees.

31. In addition to disguising the kickbacks and referral fees as "sublicense fees," "access fees," or marketing or administrative services fees, the TransactionPoint software platform and other programs also provided Defendants with a mechanism to track the kickbacks owed to real estate agents and brokers, and the amount of such kickbacks. Hundreds of real estate agents, brokers, and lenders executed TransactionPoint licensing agreements in which Defendants agreed to pay kickbacks for referrals. The First American Defendants maintained reports listing each referral made by a real estate agent to one of the Defendants and the amount paid to the real estate agent for each referral.

32. For instance, using Transaction Point, Defendants entered into sub-license agreements with the following real estate brokers and agents:

a) Coldwell Banker Grupe entered into a sub-license agreement with First American Natural Hazard Disclosure around 7/26/06 through TransactionPoint software;

b) Empire Realty Associates entered into a sub-license agreement with FAHBPC through TransactionPoint software;

c) Intero Real Estate entered into a sub-license agreement with First American Natural Hazard Disclosure around 12/06/07 through TransactionPoint software;

d) DRM Diversified, LLC and DRM Pacific Properties, Inc. entered into a sub-license agreement with FAHBPC around 7/01/06 through TransactionPoint software;

e) RE/MAX Valley Properties entered into a sub-license agreement with FAHBPC through TransactionPoint software; and

f) Remax Camino Real entered into a sub-license agreement with FAHBPC through TransactionPoint software.

33. Defendant Pacific Union International, Inc. required its agents to use TransactionPoint during the class periods. In fact, documents obtained from the U.S. Department of Housing and Urban Development indicate that Pacific Union had a pattern and practice during the class periods of withholding agents' checks until and unless they entered all their orders for real estate settlement services in pending escrow transactions through TransactionPoint. In other words, because Pacific Union wanted to ensure that it received its kickbacks from the various real estate

-10-

settlement service providers, it told its agents that they would not be paid until they took the steps necessary to ensure that Pacific Union would get paid its kickbacks. Moreover, during the class periods, Pacific Union and its agents received things of value from Defendants and other real estate settlement service providers in the form of offers to contribute and/or contributions and/or reductions in the premiums and/or deductibles for the agents' errors and omissions ("E&O") insurance in exchange for referring their clients to Defendants for the provision of real estate settlement services. During the class periods, Pacific Union received kickbacks from providers of real estate settlement services for the referral of, at a minimum, home protection plans, natural hazard disclosure reports, title policies, and escrow services. The payments were made to Pacific Union by the providers of the real estate settlement services and disguised as TransactionPoint "sublicense agreement fees," marketing fees, and/or administrative services fees. In the case of natural hazard disclosure reports, the payments were typically $25 for each referral. In the case of home protection contracts, the payments were typically $15 for each referral. The kickbacks for the referral of title and escrow services were typically $100 per referral.

## VI.    DEFENDANTS' VIOLATIONS OF CAL. INS. CODE §§ 12404 AND 12760

34.    During the class periods, Defendant FAHBPC was a "home protection company" as defined by Cal. Ins. Code § 12740(b). Defendant FAHBPC further sold, during the class periods, "home protection contracts," which are defined as "a contract or agreement whereby a person, other than a builder, seller, or lessor of the home which is the subject of the contract, undertakes for a specified period of time, for a predetermined fee, to repair or replace all of any part of any component, system or appliance of a home necessitated by wear and tear, deterioration or inherent defect, arising during the effective period of the contract, and, in the event of an inspection conducted pursuant to subdivision (b) of Section 12761, by the failure of that inspection to detect the likelihood of any such loss." Cal. Ins. Code § 12740(a).

35.    During the class periods, Defendants and/or their parents and subsidiaries, acting in concert and pursuant to a conspiracy, paid real estate agents and/or brokers commissions as an

1  inducement or compensation for the sale of home protection contracts issued by Defendant
2  FAHBPC. Defendant FAHBPC is a California corporation. During the class periods, it was
3  headquartered, and remains headquartered, in Van Nuys, California. While FAHBPC sold home
4  warranty contracts nationwide (except in Alabama, Connecticut, Delaware, Illinois, Louisiana,
5  Massachusetts, Minnesota, New Jersey, New York, Oklahoma, Rhode Island, Washington, and
6  Wisconsin) during the class periods, all its home warranty plans were drafted at its headquarters in
7  California.

8       36. During the class periods, Defendants, acting in concert and pursuant to a conspiracy,
9  paid commissions to real estate agents and/or brokers, including Defendant Pacific Union, as an
10  inducement or compensation for the placement or referral of title business. Defendants violated Cal.
11  Ins. Code §§12404-12406. "Title business" means the "business of title insurance" as defined in
12  Cal. Ins. Code §12340.3, and includes, but is not limited to, the offering of title insurance, escrow, or
13  other services by a title insurer, underwritten title company, or controlled escrow company.

14       37. Because of Defendants' payments of such commissions and compensation, the prices
15  of Defendants' home protection contracts, title business, and other real estate settlement services
16  were inflated during the class periods, and were higher than they would have been absent payment of
17  the commissions and compensation. As a result, Plaintiffs and the classes suffered harm.

18       38. On February 21, 2008, HUD issued an Advisory Opinion determining that home
19  protection companies such as FAHBPC were violating RESPA. The Opinion held that a transaction
20  in which a real estate broker or agent receives a fee only when a consumer purchases or receives a
21  home warranty contract is likely a violation of Section 8 of RESPA. HUD's letter found that
22  RESPA is likely violated when home warranty companies such as Defendant FAHBPC enter into
23  either of the following two types of arrangements:

24       (a) Marketing Agreement. A "Marketing Agreement" is an agreement pursuant
25  to which a home warranty company such as Defendant FAHBPC enters into an arrangement with a
26  real estate agent or broker pursuant to which the broker or agent agrees to provide numerous, varied,
27  and sundry marketing-related services to promote the sale of the home warranty company's home
28

1   warranty contracts.  The real estate agent or broker is only compensated when a consumer purchases
2   a home warranty contract.

3           (b)     Administrative Services Agreement.  An "Administrative Services
4   Agreement" is an agreement between a real estate agent or real estate broker and a home warranty
5   company.  Under this agreement the real estate agent/broker agrees to perform numerous, varied,
6   and sundry administrative-related services to promote the home warranty company's product.  As
7   under a "Marketing Agreement," the real estate agent/broker is compensated only when the
8   consumer purchases a home warranty contract.

9           39.     HUD further noted that Section 8(c) of RESPA provides on exception to this
10  prohibition on fees and kickbacks for bona fide compensation for "good or facilities actually
11  furnished for services actually performed."  HUD stated that this exception would not apply in a
12  situation where the real estate agent was only compensated if the home warranty contract was
13  actually purchased.  "Because the payments are based on the number of successful transactions, they
14  appear to be payments made pursuant to an agreement or understanding to refer business to the
15  [home warranty company, and not payments for services actually performed."  Further,
16  characterizing such arrangements as "marketing" or "administrative" agreements does not render the
17  underlying conduct legal.  *Id.*  These kinds of payments made by home warranty providers to real
18  estate agents are "only a means to facilitate payments for referrals by persons in a position to refer
19  settlement service business, in violation of RESPA."  *Id.*

20          40.     In response to HUD's February 21, 2008 Opinion, the National Association of
21  Realtors ("NAR"), in cooperation and consultation with Defendant FAHBPC and some of its
22  competitors who were also paying commissions and fees to real estate agents, sent a letter to HUD
23  dated May 21, 2008 which admitted the agreements pursuant to which Defendant FAHBPC was
24  paying kickbacks to real estate agents.  The letter also admitted that home warranty companies were
25  paying real estate agents "*a flat fee per home warranty application submitted to the HWC [home*
26  *warranty company]."*

27          41.     While the NAR advocated in the letter for the position that real estate agents were
28  providing services separate and apart from the mere referral of real estate settlement services to

-13-

1  corporations such as Defendants, the NAR acknowledged that the Advisory Opinion "**suggests that**
2  **real estate brokers/agents would have difficulty ever showing that the services performed under**
3  **such agreements merit compensation and that transaction-based compensation essentially renders**
4  **their compensation a sham.**"

5      42.   In addition, the evidence pertaining to the other Defendants demonstrates that all
6  Defendants were utilizing TransactionPoint and other standardized programs and methods to pay
7  kickbacks, commissions, and compensation to real estate agents as an inducement for the placement
8  or referral of other real estate settlement services.

9      43.   Whether the real estate agents and brokers were providing any services whatsoever in
10  exchange for the admitted payments is completely irrelevant to Defendants' violations of Cal. Ins.
11  Code §§12404-12406 and 12760 since the statutes reflect an absolute prohibition of payments or
12  compensation to real estate agents or any other persons as an inducement to the sale or placement of
13  home protection contracts and title business. The NAR has previously conceded that the whole
14  purpose of the payments was to influence real estate agents to promote their home protection
15  contracts. The May 21, 2008 letter to HUD from the NAR plainly stated that home warranty
16  companies such as FAHBPC were paying real estate agents *for "[t]he work required to market and*
17  *sell a home warranty.*" The letter not only admitted the practice, but also boldly stated that "real
18  estate brokers/agents are entitled to reasonable compensation for marketing and administering [home
19  warranties] on HWC's [home warranty companies'] behalf."

20      44.   Notwithstanding the February 21, 2008 Advisory Opinion and the failure of
21  Defendants' concerted and substantial lobbying efforts, Defendant FAHBPC continued its practice
22  of paying commissions and fees to real estate agents and brokers as an inducement or compensation
23  for the issuance, purchase, or acquisition of home protection contracts issued by Defendant
24  FAHBPC. It also continued to conceal the payments from Plaintiffs and the classes. The other
25  Defendants similarly continued to pay unlawful compensation to real estate agents during the class
26  periods.

## VII. CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

45. The Defendants and the non-defendant real estate agents and brokers engaged in a conspiracy, common enterprise, and/or common course of conduct commencing by at least the beginning of the RESPA Class Period and continuing thereafter. During this time, the Defendants and real estate agents and brokers concealed the true facts as alleged herein.

46. Defendants conspired with hundreds, if not thousands, of real estate agents and firms concerning the kickbacks and unlawful compensation. While the full identity of all the real estate agents is within the exclusive knowledge of Defendants, information recently acquired by Plaintiffs indicates that Defendants conspired with and signed TransactionPoint licensing agreements with, at a minimum, Pacific Union and Non-Defendants Coldwell Banker, Empire Realty Associates, Intero Real Estate, DRM Diversified, LLC, DRM Pacific Properties, Inc., RE/MAX Valley Properties, Remax Camino Real, and numerous other brokers throughout California and the rest of the United States.

47. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Defendants' violations of law, kickbacks, and unlawful conduct; and to conceal adverse information concerning the Company's operations and kickbacks paid to real estate agents and brokers; and for the real estate agents to profit at the expense of their clients.

48. The Defendants and non-defendant real estate agents and brokers accomplished their conspiracy, common enterprise, and/or common course of conduct by entering into the unlawful TransactionPoint and other agreements and by purposefully, recklessly, or negligently paying and failing to disclose kickbacks, commissions, and payments to real estate agents and brokers. Each Defendant and non-defendant was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

49. Defendants actively worked with each other and with the non-defendant real estate agents and brokers to effectuate and carry out the conspiracy and scheme. Steve Murnin was one of the persons who implemented the TransactionPoint scheme and conspiracy, and he showed the conspiring real estate agents and brokers how to design and implement the TransactionPoint software

-15-

1  so that the real estate agents and brokers could procure the unlawful kickbacks and compensation
2  from real estate settlement providers. As just one example, during the class periods, Murnin wrote a
3  letter to North American Title of Modesto, California *on behalf of and with the knowledge and*
4  *consent of PMZ Real Estate*, a participant in the TransactionPoint license agreements, encouraging
5  North American Title to participate as a sub-licensee in PMZ Realty's TransactionPoint software
6  scheme. Murnin told North American Title that, if it chose to participate in the program, it would be
7  featured as a "Preferred Vendor" for title and escrow services. In exchange, Murnin told North
8  American Title that it would be required to pay PMZ Realty a "user fee" of $75 for each transaction,
9  ostensibly for use of the TransactionPoint software but in reality, a kickback for the referral of the
10  real estate settlement service by PMZ Realty to North American Title.

11      50.      Real estate settlement providers had no illusion that the payments they were being
12  asked to make were payments for "software." Instead, they understood very clearly that Defendants
13  and the real estate agents were asking for illegal kickbacks in exchange for the referral of real estate
14  settlement services. For example, upon receiving Murnin's letter, North American Title had its
15  General Counsel and Exec. V.P., Jeffrey Brown, write a letter to HUD complaining about
16  Defendants' illegal conduct. Brown attached Murnin's correspondence about TransactionPoint and
17  stated his belief that "the software is simply a device to illegally rebate ($75) per title and escrow
18  from a title company to a real estate broker. The rebate is camouflaged as an access fee to the real
19  estate broker's order placement software. In reality, there is no significant worth or value to the
20  order placement software, as any real estate professional today can place and monitor title and
21  escrow orders by email or by accessing a title company's website. . . The realtor does nothing for
22  the fee." In his letter, Brown specifically identified Defendant First American Tile Company in
23  California as one of the real estate settlement service providers that was participating in the kickback
24  scheme and conspiracy.  Moreover, documents reviewed by Plaintiffs' Counsel reflect that
25  defendants First American Home Buyers Protection Corp. and First American Natural Hazard
26  Disclosures LLC were signatories to sub-license agreements involving TransactionPoint.

27      51.      While North American Title refused to pay kickbacks to PMZ Realty and other real
28  estate agents, many real estate settlement service providers, including the Defendants named herein,

1  agreed to pay the kickbacks in order to procure "increased business," the stated purpose explicitly
2  mentioned by Murnin in his letters to real estate settlement providers.

3      52.    Each of the Defendants and the non-defendant real estate brokers and agents aided
4  and abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such
5  actions to substantially assist the commission of the wrongdoing complained of herein, each
6  Defendant and non-defendant real estate agent and broker acted with knowledge of the primary
7  wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his,
8  her, or its overall contribution to and furtherance of the wrongdoing.

9      53.    At all times relevant hereto, each of the Defendants and non-defendant real estate
10 agents and brokers were the agent of each of the other, and were at all times acting within the course
11 and scope of such agency.

12     54.    In committing the wrongful acts particularized herein, Defendants and the non-
13 defendant real estate agents and brokers have pursued or joined in the pursuit of a common course of
14 conduct, and have acted in concert with one another in furtherance of their common plan or design.
15 In addition to the wrongful conduct particularized herein as giving rise to primary liability,
16 Defendants and the non-defendant real estate agents and brokers further aided and abetted, and/or
17 assisted each other in breach of their respective duties.

18     55.    Each of the Defendants and the non-defendant real estate agents and brokers aided
19 and abetted, and rendered substantial assistance in the wrongs detailed herein. In taking such actions
20 to substantially assist the commission of the wrongdoing detailed herein, each Defendant and the
21 non-defendant real estate agents and brokers acted with knowledge of the primary wrongdoing,
22 substantially assisted the accomplishment of that wrongdoing, and was aware of his, her, or its
23 overall contribution to and furtherance of the wrongdoing.

24 **VIII.    EQUITABLE TOLLING**

25
26     56.    During the relevant period, Plaintiffs did not discover and could not have discovered,
27 through the exercise of due diligence, Defendants' violations of RESPA and California law because
28 Defendants did not disclose, and actively concealed, their unlawful payments of referral fees and

1  commissions to the real estate agents and brokers. Plaintiffs were unaware of and had no knowledge
2  of Defendants' business arrangements and agreements among and between themselves and/or the
3  real estate agents and brokers.

4    57.    Plaintiffs could not have discovered Defendants' violations of law prior to filing suit
5  because Defendants made absolutely no disclosure of the kickbacks to the real estate agents and
6  brokers in the escrow documents, HUD-1 statements, or any other documents. Thus, none of the
7  documents provided to the Plaintiffs made any disclosure of any payment/kickback to the real estate
8  agents or brokers for the referral of real estate settlement services.

9    58.    Moreover, as noted above, Defendants not only failed to disclose any information
10  whatsoever that would have allowed Plaintiffs, exercising due diligence, to discover the illegal
11  kickbacks, but Defendants intentionally fabricated untrue and non-existent services allegedly
12  performed by the real estate agents in order to attempt to disguise the illegal kickbacks and avoid
13  detection by consumers, HUD, and federal and state regulators. These intentional efforts at
14  concealment were wildly successful, as Defendants avoided detection until July 2011 when HUD
15  publicly disclosed its investigation into TransactionPoint for the first time, noting that real estate
16  settlement service providers utilized the software program to make unlawful kickbacks and improper
17  referral fees in violation of RESPA.

18    59.    Further, the TransactionPoint software used by Defendants concealed the payments
19  since it provided Defendants with a non-public way to keep track of which real estate agents were
20  owed kickbacks for referring specific real estate settlement services sold by Defendants. Since it
21  was software used internally by the real estate agents and Defendants, it did not show up on the
22  HUD-1 statements or other escrow documents and thus, did not alert consumers or regulators as to
23  the kickbacks. In addition, Defendants' conduct constitutes a continuing violation of the law, and
24  thus, Plaintiff' claims did not accrue until exposure of the Defendants' illegal conduct by HUD in
25  July 2011.

26
27
28

-18-
Class Action Complaint

## IX. CLASS ACTION ALLEGATIONS

60. Plaintiffs bring this action under Federal Rule of Civil Procedure 23 on behalf of a nationwide Plaintiff class (the "RESPA Class") consisting of:

> All persons and entities in the United States who purchased any real estate settlement service from any Defendant named herein in connection with the purchase or sale of a home financed by a federally related mortgage during the period January 1, 2002 to the present (the "RESPA Class Period"), where any portion of the fees or premiums for such settlement services was paid to any real estate broker or agent. Excluded from the RESPA Class are Defendants, their parents, subsidiaries, and affiliates, all officers, directors, employees, and agents of the Defendants and their parents, subsidiaries and affiliates, any real estate agent or broker involved in any of the transactions at issue in this complaint, any agent or employee of any federal or state government acting in their official capacity, and co-conspirators.

61. Plaintiff bring this action under Federal Rule of Civil Procedure 23 on behalf of a second nationwide Plaintiff class (the "Pacific Union Class") consisting of:

> All persons and entities in the United States who utilized Pacific Union as their broker in connection with the purchase or sale of a home financed by a federally related mortgage during the period January 1, 2002 to the present (the "Pacific Union Class Period"), where any portion of the fees or premiums for settlement services purchased by the class member in such transaction was paid to Pacific Union by the provider of the real estate settlement service. Excluded from the Pacific Union Class are Defendants, their parents, subsidiaries, and affiliates, all officers, directors, employees, and agents of the Defendants and their parents, subsidiaries and affiliates, any real estate agent or broker involved in any of the transactions at issue in this complaint, any agent or employee of any federal or state government acting in their official capacity, and co-conspirators.

62. Plaintiffs do not know the exact number of class members because such information is in the exclusive control of Defendants. Upon information and belief, Plaintiffs believe that there are hundreds of thousands of class members, geographically dispersed throughout the United States, such that joinder of all class members is impracticable.

63. Plaintiffs' claims are typical of the claims of the RESPA Class and Pacific Union Class in that: Plaintiffs purchased real estate settlement services from Defendants during the class periods, Defendants violated Section 8(a) and/or 8(b) of RESPA; Pacific Union breached its

-19-

1 fiduciary duties by not disclosing the payments to Plaintiff and class members; Plaintiffs and all
2 RESPA Class and Pacific Union Class members were damaged by the same wrongful conduct of
3 Defendants and their co-conspirators as alleged herein; and the relief sought is common to the
4 RESPA Class and Pacific Union Class.

5      64.    Numerous questions of law or fact arise from Defendants' unfair and anticompetitive
6 conduct that is common to the RESPA Class and Pacific Union Class. Among the questions of law
7 or fact common are:

8      (a)    whether Plaintiffs and the class members purchased or acquired real estate
9 settlement services from Defendants during the class periods;

10      (b)    whether during the class periods Defendants entered into a scheme with real
11 estate brokers and/or agents whereby Defendants paid a portion of the fees, premiums, and monies
12 received for providing real estate settlement services to real estate brokers and agents through
13 administrative services agreements, marketing agreements, and/or licensing agreements;

14      (c)    whether, in an effort to effectuate this scheme, real estate brokers and/or
15 agents were encouraged and/or compensated by Defendants to enter into standardized agreements;

16      (d)    whether the wrongful conduct alleged herein between Defendants and real
17 estate brokers and agents are sufficient to establish the existence of a conspiracy;

18      (e)    whether Defendants issued and/or sold real estate settlement services to
19 Plaintiffs and the RESPA Class and Pacific Union Class during the class periods;

20      (f)    whether Defendants violated Section 8(a) and/or Section 8(b) of RESPA
21 during the RESPA Class Period;

22      (g)    whether Plaintiffs and the class are entitled to restitution, and if so the
23 measure of such restitution;

24      (h)    whether Plaintiffs and the class members have been damaged, and if so, the
25 appropriate measure of such damages;

26      (i)    whether Pacific Union owed fiduciary duties as a real estate agent to its clients
27 and whether it breached those duties and committed constructive fraud by failing to disclose the
28 kickbacks and commissions; and

-20-
Class Action Complaint

1              (j)     whether class-wide declaratory and/or injunctive relief is appropriate and, if

2  so, the proper measure of the declaratory and/or injunctive relief.

3          65.     These questions of law or fact are common to the RESPA Class and Pacific Union

4  Class and predominate over any other questions affecting only individual class members.

5          66.     Plaintiffs will fairly and adequately represent the interests of the classes in that: (1)

6  Plaintiffs purchased real estate settlement services from Defendants during the class periods; (2)

7  Plaintiffs suffered damages and/or are entitled to restitution; and (3) Plaintiffs have no conflicts with

8  any other member of the RESPA Class or Pacific Union Class. Further, Plaintiffs have retained

9  competent counsel experienced in class-action litigation.

10        67.     A class action is superior to the alternatives, if any, for the fair and efficient

11  adjudication of this controversy.

12        68.     Prosecution of separate actions by individual class members would create the risk of

13  inconsistent or varying adjudications, establishing incompatible standards of conduct for the

14  Defendants.

15        69.     Injunctive relief is appropriate as to the RESPA Class and Pacific Union Class as a

16  whole because Defendants have acted or refused to act on grounds generally applicable to the

17  RESPA Class and Pacific Union Class.

18        70.     Plaintiffs reserve the right to expand, modify, or alter the class definitions in response

19  to information learned during discovery.

20

21                                **FIRST CAUSE OF ACTION**

22   **(Violations of RESPA, 12 U.S.C. § 2607 – On Behalf of Plaintiffs and the Class Against All**

23                                   **Defendants)**

24        71.     Plaintiffs repeat and reallege the allegations contained above as if fully stated herein.

25        72.     Defendants violated numerous provisions of the RESPA, 12 U.S.C. §§ 2601, et seq.,

26  as well as Regulations for Real Estate Settlement Procedures, known as Regulation X, promulgated

27  by HUD, 24 C.F.R. §§ 3500, et seq. During the RESPA Class Period, Defendants systematically

28  and repeatedly violated 12 U.S.C. §§ 2607(a) and 2607(b), and 24 C.F.R. §§ 3500.14(b) and (c) by

1  paying real estate agents and brokers kickbacks for the referral of real estate "settlement services,"
2  and/or a portion of the charges for such real estate "settlement services," in respect of "federally
3  related mortgage loans," as such terms are defined by RESPA §§ 2602(1) and (3), and as further
4  alleged herein. Such payments by Defendants were disguised as sublicense fees to the Company's
5  TransactionPoint software platform and/or as marketing fees or administrative services fees.

6      73.    Throughout the RESPA Class Period, Defendants provided "settlement services" in
7  respect of "federally related mortgage loans," as such terms are defined by RESPA §§ 2602(1) and
8  (3). Such settlements services included, but were not limited to, title insurance, home warranty
9  contracts, escrow services, and property hazard reports.

10      74.    Throughout the RESPA Class Period, Defendants unlawfully paid "things of value,"
11  within the meaning of RESPA § 2602(2), to real estate brokers and agents, including Defendant
12  Pacific Union, in connection with the referral of real estate settlement services. Defendants paid,
13  and real estate agents and brokers received, millions of dollars in purported sublicense fees that
14  constituted fees, kickbacks or things of value incident to real estate settlement services involving
15  federally related mortgage loans. The real estate agents and brokerages performed no services for
16  such payments. This practice violated RESPA, 12 U.S.C. § 2607(a) and 24 C.F.R. §§ 3500.14(b)
17  and (c).

18      75.    Further, throughout the RESPA Class Period, in connection with transactions
19  involving federally related mortgage loans, Defendants paid, and real estate agents and brokers,
20  including Pacific Union, received through purported sublicense agreements, marketing agreements,
21  and administrative services agreements, a portion, split, or percentage of charges received by
22  Defendants for the rendering of real estate settlement services and/or business incident to real estate
23  settlement services other than for services actually performed. The real estate agents and brokerages
24  performed no services for such payments. This practice violated RESPA, 12 U.S.C. § 2607(b) and
25  24 C.F.R. § 3500.14(c). Agents and brokers participated in the scheme and served as the direct party
26  to which the portion, split, or percentage of Defendants' settlement service charges were ceded.

27      76.    Plaintiffs and the RESPA Class were, in fact, harmed by Defendants' unlawful
28  scheme.

77. First, Plaintiffs and the RESPA Class members were, as a matter of law, entitled to purchase settlement services from providers that did not participate in unlawful kickback and/or fee-splitting schemes. Congress has expressly provided for private enforcement of this protected right by empowering consumers to recover statutory damages from offending parties without proof of an overcharge. The plain, unambiguous language of RESPA, Section 8(d)(2) indicates that damages are based on the settlement service amount with no requirement that there has been an overcharge. Plaintiffs allege that Defendants have accepted unlawful kickback payments and/or an unearned portion of settlement service charges in violation of RESPA—allegations and claims completely distinct and separate from whether the price they paid for settlement services was excessive.

78. Defendants' scheme resulted in a limitation on both settlement service choice and competition. Plaintiffs and the RESPA Class were subjected to settlement services tainted by kickbacks or referrals of business inherently biased by Defendants' unlawful kickback scheme. Defendants' sublicensing and other agreements with real estate agents and brokers over time affected the price, quality, or other characteristics of the "referred" settlement services through, among other things, inherent limits on settlement service choice and competition. Further, as set forth above, Defendants did not disclose the true nature of the referral arrangements to Plaintiffs.

79. Second, Plaintiffs and the RESPA Class were, in fact, harmed in that, their settlement service premiums were artificially inflated as a result of Defendants' conduct. The kickbacks and unearned fees alleged herein unnecessarily and artificially inflated the price of settlement service charges paid by Plaintiffs. Indeed, Congress has already determined that the aggregate effect of an unlawful kickback/referral arrangement is to unnecessarily inflate the costs consumers pay for real estate settlement services. *See* 12 U.S.C. § 2601(b).

80. Under Defendants' scheme, the settlement service premiums paid by Plaintiffs and the RESPA Class necessarily and wrongly included payments for both: (a) actual settlement services; and (b) payments unlawfully kicked back to agents and brokers that far exceeded the value of any services performed (indeed, there were no services performed in return for this payment) and, which were also illegal referral fees.

81.     Therefore, Defendants have violated RESPA, 12 U.S.C. §§ 2607(a) and (b). Pursuant to RESPA, 12 U.S.C. § 2607(d), Defendants are jointly and severally liable to Plaintiffs and the RESPA Class in an amount equal to three times the amounts they have paid or will have paid for Defendants' settlement services as of the date of judgment.

82.     In accordance with RESPA, 12 U.S.C. § 2607(d), Plaintiffs also seek attorneys' fees and costs of suit.

## SECOND CAUSE OF ACTION

**(On Behalf of Plaintiffs and Against All Defendants For A Declaratory Judgment Under 28 U.S.C. § 2201(A) And An Injunction)**

83.     Plaintiffs repeat and reallege the allegations contained above as if fully stated herein.

84.     The Defendants have a duty to comply with RESPA, Cal. Ins. Code §§ 12404-12406 and 12760, Cal. Bus. & Prof. Code §§ 17200, et seq., and with respect to Defendant Pacific Union, its fiduciary duties as a real estate agent and broker.

85.     An actual and substantial controversy exists between Plaintiffs and Defendants since Defendants deny that their conduct violates RESPA, Cal. Ins. Code §§ 12404-12406 and 12760, Cal. Bus. & Prof. Code §§ 17200, et seq., and the law applicable to fiduciaries.

86.     The Defendants have violated and continue to violate RESPA, Cal. Ins. Code §§ 12404-12406 and 12760, Cal. Bus. & Prof. Code §§ 17200, et seq., and with respect to Pacific Union, the law governing an agent's fiduciary duties, by the conduct alleged herein.

87.     As a direct and proximate result of the Defendants' violation of RESPA, Cal. Ins. Code §§ 12404-12406 and 12760, Cal. Bus. & Prof. Code §§ 17200, et seq., and the laws pertaining to fiduciaries, Plaintiffs have been injured. Moreover, the general public is threatened with harm.

88.     Plaintiffs seek (a) a declaratory judgment that the Defendants' conduct violates RESPA, Cal. Ins. Code §§ 12404-12406 and 12760, Cal. Bus. & Prof. Code §§ 17200, et seq., and/or the laws pertaining to real estate agents, and (b) an injunction that bars the Defendants from further violating such laws.

1

**THIRD CAUSE OF ACTION**

2

**(On Behalf of Plaintiff Mlynar and the Pacific Union Class and Against Defendant Pacific Union for Breach of Fiduciary Duty)**

3

4   89.   Plaintiff Mlynar repeats and realleges the allegations contained above as if fully

5   stated herein.

6   90.   Defendant Pacific Union owed fiduciary duties to Plaintiff and the Class as a result of

7   serving as Plaintiff's agent in a residential real estate transaction. As a real estate agent, Pacific

8   Union and its agents owed Plaintiff and the Class fiduciary duties of care, loyalty, and candor. A

9   broker's fiduciary duty to his client requires the highest good faith and undivided service and loyalty.

10  A fiduciary must tell its principal of all information it possesses that is material to the principal's

11  interests. Pacific Union had a duty to disclose to Plaintiff and the Class any commissions, rebates,

12  kickbacks or payments that it was receiving from any parties in the real estate transaction in which it

13  was representing the interests of Plaintiff and the Class.

14  91.   In breach of its fiduciary duties, Pacific Union concealed, and failed to disclose, the

15  kickbacks it was receiving from persons and entities providing real estate settlement services in the

16  relevant real estate transactions in which it was serving as a real estate agent for Plaintiff and the

17  Class.

18  92.   As a result of Pacific Union's breaches of fiduciary duty, Plaintiff and the Class were

19  damages in that they were charged higher amounts for the real estate settlement services due to the

20  undisclosed kickbacks, payments, commissions and other things of value received by Pacific Union.

21

**FOURTH CAUSE OF ACTION**

22

**(On Behalf of Plaintiff Mlynar and the Pacific Union Class and Against Defendant Pacific Union for Constructive Fraud)**

23

24  93.   Plaintiff Mlynar repeats and realleges the allegations contained above as if fully

25  stated herein.

26  94.   Defendant Pacific Union owed fiduciary duties to Plaintiff and the Class as a result of

27  serving as the agent in residential real estate transactions for Plaintiff and the Class. As a real estate

28  agent, Pacific Union and its agents owed Plaintiff and the Class fiduciary duties of care, loyalty, and

-25-

candor, and owed the same duties as a trustee owes to a beneficiary. A broker's fiduciary duty to his client requires the highest good faith and undivided service and loyalty. A fiduciary must tell its principal of all information it possesses that is material to the principal's interests. Pacific Union had a duty to disclose to Plaintiff and the Class any commissions, rebates, kickbacks or payments that it was receiving from any parties in the real estate transactions in which Pacific Union was representing the interests of Plaintiff and the Class.

95. In breach of its fiduciary duties, Pacific Union actively concealed, and failed to disclose, the kickbacks it was receiving from persons and entities providing real estate settlement services in the relevant real estate transactions in which it was serving as a real estate agent for Plaintiff and the Class. Pacific Union's concealment was an act of bad faith and a disloyal act designed to further its own interests at the expense of Plaintiff and the Class. By intentionally failing to disclose the payments and kickbacks it was receiving from providers of real estate settlement services, Pacific Union increased compensation to itself. Plaintiff and the Class were harmed in that they were charged and paid inflated prices for the real estate settlement services.

96. A real estate agent, as a fiduciary, is liable to his principal for constructive fraud even though his conduct is not actually fraudulent. Constructive fraud is a unique species of fraud applicable only to a fiduciary or confidential relationship. As a general principle, constructive fraud comprises any act, omission or concealment involving a breach of legal or equitable duty, trust or confidence which results in damage to another even though the conduct is not otherwise fraudulent. The failure of Pacific Union to disclose the material facts alleged herein to Plaintiff and the Class concerned material facts that might affect Pacific Union's motives or the decisions of Plaintiff and the Class. Moreover, the undisclosed facts were known or should have been known to Pacific Union.

97. As a result of Pacific Union's conduct, Plaintiff and the Class were damaged. Because Pacific Union acted in bad faith and in a disloyal manner, and benefited financially from its wrongful conduct at the expense of Plaintiff and the Class, Plaintiff seeks damages as well as return and disgorgement of the commissions that Pacific Union received for acting as a real estate agent in the real estate transactions.

**FIFTH CAUSE OF ACTION**

**(On Behalf of Plaintiff Mlynar and the Pacific Union Class and Against Defendant Pacific Union for Unjust Enrichment)**

98.     Plaintiff Mlynar repeats and realleges the allegations contained above as if fully stated herein.

99.     Due to its conduct alleged herein, Defendant Pacific Union was unjustly enriched at the expense of Plaintiff and the Pacific Union Class.  Pacific Union received undisclosed kickbacks, commissions, payments and other things of value from persons and entities that provided real estate settlement services to Plaintiff and the Pacific Union Class in transactions where Pacific Union served as the agent for Plaintiff and the Pacific Union Class.  Pacific Union actively concealed those kickbacks and commissions.

100.     As a result of Pacific Union's wrongful conduct, it was unjustly enriched.  The kickbacks, payments, commissions, and other things or value received by Pacific Union were not in exchange for any services rendered by Pacific Union, and the undisclosed payments resulted in Plaintiff and the Class being charged higher amounts for the real estate settlement services due to the undisclosed kickbacks, payments, commissions and other things of value received by Pacific Union.

101.     Due to its unjust enrichment, Pacific Union should be required to disgorge the amounts by which it was unjustly enriched, including the kickbacks and any commissions received.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.     A declaration that this action is a proper class action under Fed. R. of Civ. P. 23(b)(3) on behalf of the Classes, as defined herein, and an order directing that reasonable notice of this action be given to each member of the RESPA Class and Pacific Union Class;

B.     A declaratory judgment that the Defendants' conduct alleged herein constitutes a violation of RESPA, Regulation X, Cal. Ins. Code §§ 12404-12406 and 12760 and, in the case of Pacific Union, its fiduciary duties as a real estate agent and broker;

C.     An injunction enjoining, preliminarily and permanently, Defendants from continuing the unlawful conduct alleged herein;

1   D.  For restitution to Plaintiffs and each member of the RESPA Class and Pacific Union

2 Class of all sums unlawfully collected by Defendants from the Plaintiffs and other members of the

3 Classes during the class periods;

4   E.  For treble damages for the RESPA violations;

5   F.  An award for Plaintiffs and the RESPA Class and Pacific Union Class for the costs of

6 this suit (including expert fees), and reasonable attorneys' fees, as provided by law; and

7   G.  An award for such other and further relief as the nature of this case may require or as

8 this Court deems just, equitable, and proper.

9             **JURY DEMAND**

10   Plaintiffs demand a jury trial of all triable issues.

11

12 DATED: July 3, 2012        CHAPIN FITZGERALD

                  SULLIVAN & BOTTINI, LLP

13

14                  Keith Cochran

                  KEITH M. COCHRAN

15

16              Edward D. Chapin, Esq. (SBN: 053287)

                Francis A. Bottini, Esq. (SBN: 175783)

17              Jill S. Sullivan, Esq. (SBN: 185757)

                Keith M. Cochran, Esq. (SBN: 254346)

18              550 West "C" Street, Suite 2000

                San Diego, California 92101

19              Tel: (619) 241-4810

                Fax: (619) 955-5318

20

              Counsel for Plaintiffs

21

22

23

24

25

26

27

28

               -28-